County Seat of La Fayette County ex rel. James H. Knowlton.

IN THE MATTER OF THE COUNTY SEAT OF LA FAYETTE COUNTY ex rel. JAMES H. KNOWLTON.

1. COUNTY SEAT—CONSTITUTION.—The act of 1846, dividing Iowa county, and establishing La Fayette county, provided for the purchase of a quarter section of land in a certain town for the county seat (the Centre), the purchase was made accordingly. Subsequently the act of 1847, organizing the county, provided that "until suitable buildings are provided at the county seat, the courts and public offices shall be held at such place as the commissioners shall select," and Shullsburg was selected for that purpose. An act of 1848 provided for determining the location of the county seat by a popular vote, and that, until the county seat

should be so selected, it should be and remain at Shullsburg; but no selection was made when the constitution was adopted, providing that "no county seat shall be removed until the point to which it is proposed to be removed shall be fixed by law, and a majority of the voters of the county voting on the question shall have voted in favor of its removal to that point. In March, 1849, an act was passed, authorizing a vote on the question of the removal of the county seat, which provided that if a majority of the votes should be *for removal* to Shullsburg, then it should be the permanent county seat; but if there was no such majority *for removal,* then the county seat should *continue* to be permanently located at the Centre; and a vote was had accordingly, the result of which was in dispute, as well as the then location of the county seat.

*Held,* 1. That the act of 1848 removed the county seat to Shullsburg, where it remained at the time of the adoption of the constitution, and it could be removed from that place only in conformity with the constitutional provision or the act of 1848.

2. That the act of March 11, 1849, assuming the false hypothesis, that the county seat was elsewhere, no valid action or election could be held under it.

3. That the legislative recognition, in the act of 1849, that the county seat was at the Centre, was unavailing, the legislature having no power to pass such a declaratory law. The right of the judiciary alone to declare what the law is, asserted, and the power of the legislature in any ordinary case to pass a declaratory law is doubted.

4. That, as a matter of law, irrespective of the result of the election under the act of 1849, the county seat still remained at Shullsburg.

(2 *Chand.* 212.)

CERTIFIED case from the Circuit Court for *La Fayette* County.

This matter came before the court upon the certificate of the circuit judge of the fifth circuit, upon the relation of *James H. Knowlton,* under the provisions of an act of the legislature, entitled " an act to provide for the final settlement of the location of the county seat of the county of La Fayette," approved January 29, 1850, and whereby it was required that the said circuit judge should make a statement of the votes cast at the general annual election in the county, in the year 1848, upon the question of location of the county seat, which election was had under the provisions of an act of the territorial legislature, entitled " an act to authorize the

voters of La Fayette county to vote for locating the county seat thereof," approved March 11, 1848 ; and also requiring the said judge, in like manner, to make a statement of the votes cast at the general annual election in the year 1849, upon the question of the removal of the county seat, under and by virtue of an act of the legislature, entitled "an act to authorize the electors of La Fayette county to vote on the removal of the county seat," approved March 31, 1849. The act of January 29, 1850, conferred jurisdiction upon this court, and made it incumbent upon it to hear, decide, and give judgment upon the matters in controversy, and thereby determine where the county seat in fact was, under the various laws relating thereto, and the proceedings had under them by the electors of the county.

The opinion of the court, making, as it does, a constitutional question the basis of its decision, it is not deemed necessary to incorporate the voluminous case made up by the parties, and certified by the judge to this court.

*James H. Knowlton*, the relator, argued :

1. That the county seat of La Fayette county, was located at Shullsburgh by an act of the territorial legislature, passed March 11, 1848, whereby it was provided that, until a county seat shall be selected and suitable county buildings thereon erected, the county seat shall be and remain at the village of Shullsburgh ; that the county seat having been established at that place, whether permanently or temporarily, but being there at the adoption of the constitution, it could only be removed through the medium of the provisions contained in that instrument, and that it was not pretended that any such means had been adopted.

2. That. the act of March 11, 1848, locating the seat at Shullsburgh, was a valid law, and in support of it, cited 1 Cow. 550.

3. That the act of March 31, 1849, was inoperative, unconstitutional and void ; inoperative, because it contained no

provisions for canvassing the votes authorized by it to be cast, upon the question of locating the county seat. That being a special law for a special purpose, the canvassing officers of the county took no authority by implication to perform any act not specifically assigned to them, and because, at the time of its enactment, the constitution was in full force, and that act was repugnant to its provisions.

4. That there was no law locating the county seat at any other place than at Shullsburg, except the act of 1846, and that it had not been shown that that act has been complied with, so as to make any location elsewhere.

*Strong & Cothren,* for the contestants of the location of the county seat at Shullsburg, argued, that the county seat was either at Shullsburg or at the Centre of the county, on the land purchased by the county for the public buildings; that in arriving at a right conclusion as to its locality, all the legislation and acts of the citizens must be considered and taken into account; that the act of 1846, established the county seat, without qualification, on a quarter section to be selected and entered or purchased, with an area of three and a half sections or square miles, which the counsel claimed had been done; that the response which had been made to the case made by the relator, showed it had been done in accordance with the act authorizing it, and that the territorial act of 1847 recognized the seat as thus established, as also it was by the act of 1848 and 1849, and by the voting which occurred under the last mentioned act, and the certified result of the votes cast; that by the votes cast under the act of 1849, there was not a majority in favor of locating it at Shullsburg, and by a resolution of the board of supervisors, the centre was recognized as the county seat; that the act of 1848, locating temporarily the holding of the courts at Shullsburg, did not create a permanent location there, and that the act of 1849, and the voting under it, establishes the location at the Centre.

County Seat of La Fayette County ex rel. James H. Knowlton.

Stow, C. J. This is a most extraordinary proceeding, and one which, in my opinion, we ought never to have entertained. The question, in the shape in which it has been presented, is not properly before us, and even if it were, it does not appear to me to be a case of which this court has original jurisdiction. The legislature having, however, in its wisdom, sent the matter to us, and we (whether as judges, commissioners, or arbitrators, it would be difficult to determine) having consented to entertain it, the parties interested are entitled to a decision, or, at least, to an expression of opinion from us.

The question is—where is the county seat of La Fayette county?

For the proper understanding of this question, it is necessary to examine at length the various statutes, as well as the constitutional provision on the subject.

The act of 1846, p. 41, dividing Iowa county, and establishing La Fayette, provides, section 3, for the purchase by the county commissioners of a quarter section of land in town 2, range 3, for the use of the county, and further provides, that the place thus purchased shall be the county seat. The commissioners made the purchase.

The act of 1847, p. 57, organizing the county, provides, section 7, " that until suitable buildings are provided at the county seat, the courts and public offices shall be held at such place as the commissioners shall select," and it seems that Shullsburg was selected for that purpose.

The act of 1848, p. 186, authorizing the people to vote for locating the county seat, provides, section 1, for the electors, on the second Monday of May following, determining by an absolute majority, the site of the county seat, and gives them unlimited authority in selecting the place. The same section further provides, that if no place should receive a majority of all the votes, at the voting in May, the electors might continue to vote on the question at every subsequent

annual election, until a county seat should be selected and located.    The next section provides, that until a county seat should be selected, as provided for by the first section, "the county seat shall be and remain at Shullsburg."    Under this act no effectual voting has been had.

Such were the laws and state of things when the constitution went into operation, and which provides, article 13, section 8, that "no county seat shall be removed until the point to which it is proposed to be removed shall be fixed by law, and a majority of the voters of the county, voting on the question, shall have voted in favor of its removal to such point."

Then comes the act of March 11, 1849, p. 139, which authorizes, section 1, the electors to vote at the general election in November following, "on the question of the removal of the county seat," and which provides, section 3, that "if a majority of the votes shall be for removal *to* Shullsburg, then Shullsburg shall be the permanent county seat; but should there not be a majority for *such removal*, then the county seat shall *continue* to be permanently located at the Centre."    A vote was had under this act, the result of which has been the subject of controversy, and was the cause of the extraordinary law of last winter, providing for this novel proceeding.

The relator, the champion of Shullsburg, claims that the vote was in favor of that place, while the other side contends that it settled the question in favor of the Centre.

In the view we take of the constitutional provision, and of the antecedent legislation on the subject, it is not necessary for us to exercise the powers of a board of county canvassers, which the legislature has attempted to confer upon us, nor to decide whether in fact Shullsburg had a majority of the legal votes.

Though the centre had been previously made the county seat, the act of 1848 provides, in express terms, that Shulls-

burg, until another place should be selected, and suitable public buildings provided at it, should be and remain the county seat; thus in effect, and by necessary implication, though not in words, removing the seat from the Centre. No other place had been selected when the constitution went into operation, and which found Shullsburg, for the time being at least, *de facto* and *de jure*, the county seat. And so, in our view of the constitution, in was to remain until the contingency contemplated by the act of 1848 occurred, or until another point had been fixed by the legislature, and approved of by the popular vote.

I cannot admit the proposition, that the county seat having been fixed at Shullsburg but temporarily, and being subject to be removed from there at any time by a popular vote, it is not within the purview of the constitution. The constitution makes no distinction between temporary and permanent county seats. In fact, up to its adoption, no county seat could be considered as permanent, the legislature having always, until then, had the power of changing a county seat at pleasure, and having often exercised that power most capriciously and vexatiously, and it was to guard against the mischief and inconvenience, and perhaps the legislative immorality of arbitrary removal, that the constitution wisely provided that *no* county seat should be removed until another point for it should be fixed by law, and approved by the people of the county. Shullsburg held, it is true, by a kind of defeasible title, and at the will of the county; but, nevertheless, its right was complete for the time being, and, for all we know, might never have been disturbed. The constitution found it in the possession of this right, and guaranteed to it its continued enjoyment, until deprived of it by virtue of the act under which it held, or by the process provided by the constitution itself.

The county seat then being at Shullsburg, on the adoption of the constitution, and not having been removed from there

Vol. II.—34

by any legal or constitutional process, it is idle to inquire whether, under the law of 1849, there was a majority of votes for removing it *to* that place. The law assumes the false hypothesis that the county seat was somewhere else, and no valid action could be had under it.

It is said, however, that the act of 1849 recognizes the Centre as the county seat, and is declaratory to that effect. I answer, with deference, that the legislative recognition proves nothing, and that the legislature had no power to pass such a declaratory law. The judiciary alone is to determine what the law is. And I much doubt whether, under the American system of written constitutions, the legislature can, in any ordinary case, enact what is properly a declaratory law. We have, in general, got our ideas of such laws from abroad, without attending to the wondrous difference there is between the legislative power in our own country and all others. The parliament of England is said to be supreme, and having the power of passing any law it pleases, even one changing its constitution, not being restrained by any organic and paramount law, it may properly, in a political sense be called so. In Russia and Turkey, the legislative power being one with the judicial and executive, is purely despotic, and may, of course, enact or declare whatever law it sees fit, being liable to be called in question by God alone. But with us the case is far different. The national congress, within the grant of powers to the general government, and the state legislatures, where not restrained by the federal or their own constitutions, may pass whatever laws they think proper, but it is still, as I have already remarked, the judiciary only which can settle what the law *is*, or *has been*. And when the legislature, national or state, undertakes to declare—in other words, to construe—the existing law, it (as a general thing) goes beyond its constitutional sphere, and usurps powers which do not belong to it. I say, as a general thing, because I admit that there are matters of legislative cognizance which are not the

subjects of judicial review, such as declaring war—declaring war already to exist by the act of another nation: and others of a like character. In these cases, the legislature, in a political sense, is supreme, and is not to be controlled by the judicial or any other human power—as in Russia and Turkey, it acts independent of every thing except the supreme judge and governor.

The conclusion of the court is, that the county seat of La Fayette county is now at Shullsburg, and that it has been there since the act of March 11, 1848, and that it is to remain there until removed as provided by that act, or until removed under the constitutional provision on the subject, and we direct the following minute to be entered of record:

In the matter of the county seat of ⎫
  La Fayette county,    ⎬
    *ex rel.*      ⎬
  James H. Knowlton.  ⎭

This matter having been argued by counsel, as well on the part of the relator as on the part of other persons interested, and due deliberation being had thereon, it is ordered, adjudged and decreed, and this court, by virtue of the statute in this case made and provided, does order, adjudge and decree that the county seat of the said county now is, and has been, since the act of the territorial legislature of March 11, 1848, at Shullsburg, in the said county ; and that it there remain, until another site is selected, and suitable buildings provided thereon, as provided by the said act of March 11, 1848, or until removed according to the provisions of the constitution.